AF Approval *KL for JAM*                                     Chief Approval *CFM*

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                     CASE NO. 8:19-cr-332-CEH-AEP

MARLON ALEXIS AGUILAR-REYES

### PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by ~~Sara C.~~ GREGORY

~~Sweeney, Acting~~ W. KEHOE United States Attorney for the Middle District of Florida, and the

defendant, Marlon Alexis Aguilar-Reyes, and the attorney for the defendant,

Rebecca Castaneda, Esq. mutually agree as follows:

A.      **Particularized Terms**

1.      Count Pleading To

The defendant shall enter a plea of guilty to Count One of the

Indictment. Count One charges the defendant with conspiracy to distribute and

possess with intent to distribute five kilograms or more of cocaine knowing,

intending, and having reasonable cause to believe that such substance would be

unlawfully imported into the United States, in violation of 21 U.S.C. §§ 963 and

960(b)(1)(B)(ii).

Defendant's Initials MAAR

2.      Minimum and Maximum Penalties

Count One is punishable by a mandatory minimum term of imprisonment of ten years up to life imprisonment, a fine of up to $10 million, a term of supervised release of at least five years up to life, and a special assessment of $100. With respect to certain offenses, the Court shall order the defendant to make restitution to any victim of the offense, and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense, or to the community, as set forth below.

3.      *Alleyne v. United States* and *Apprendi v. New Jersey*

Under *Alleyne v. United States*, 570 U.S. 99 (2013), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), a minimum sentence of ten (10) years imprisonment and a maximum sentence of life imprisonment may be imposed because the following facts have been admitted by the defendant and are established by this plea of guilty:

The defendant conspired to distribute and possess with intent to distribute five kilograms or more of a mixture or substance containing a detectable amount of cocaine knowing, intending, and having reasonable cause to believe that the cocaine would be unlawfully imported into the United States.

4.      Elements of the Offense

The defendant acknowledges understanding the nature and elements of the offense with which defendant has been charged and to which defendant is pleading guilty. The elements of Count One are:

Defendant's Initials MAAR                    2

First:      two or more people in some way agreed to accomplish a shared and unlawful plan as charged in the Indictment;

Second:     the defendant knew the unlawful purpose of the plan and willfully joined in it; and

Third:      the object of the unlawful plan was to distribute and possess with intent to distribute five kilograms or more of cocaine knowing, intending, and having reasonable cause to believe that the cocaine would be unlawfully imported into the United States.

5.    No Further Charges

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the United States Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

6.    Guidelines Sentence

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to recommend in this plea agreement. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

Defendant's Initials MAAR                    3

7.    Acceptance of Responsibility—Three Levels

At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG §3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG §3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.4., the United States agrees to file a motion pursuant to USSG §3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment of a third level for acceptance of responsibility rests solely with the Acting United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

Defendant's Initials MAAR          4

8.   Cooperation—Substantial Assistance to be Considered

Defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify, subject to a prosecution for perjury or making a false statement, fully and truthfully before any federal court proceeding or federal grand jury in connection with the charges in this case and other matters, such cooperation to further include a full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in defendant's possession or control, and to be reasonably available for interviews which the United States may require. If the cooperation is completed prior to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the Acting United States Attorney for the Middle District of Florida, warranting the filing of a motion at the time of sentencing recommending (1) a downward departure from the applicable guideline range pursuant to USSG §5K1.1, or (2) the imposition of a sentence below a statutory minimum, if any, pursuant to 18 U.S.C. § 3553(e), or (3) both. If the cooperation is completed subsequent to sentencing, the government agrees to consider whether such cooperation qualifies as "substantial assistance" in accordance with the policy of the Acting United States Attorney for the Middle District of Florida, warranting the filing of a motion for a reduction of sentence within one year of the imposition of sentence pursuant to Fed. R. Crim. P. 35(b). In any case, the defendant understands that the determination as to whether "substantial assistance" has been

Defendant's Initials MAAR          5

provided or what type of motion related thereto will be filed, if any, rests solely with the Acting United States Attorney for the Middle District of Florida, and the defendant agrees that defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9.     Use of Information—Section 1B1.8

Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

10.     Cooperation—Responsibilities of Parties

a.     The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime. However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

b.     It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full,

Defendant's Initials **MAAR**                                    6

complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

(1)    The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2)    The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement. With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by decision of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant

Defendant's Initials MAAR                    7

further agrees to waive the statute of limitations and any speedy trial claims on such charges.

(3)    The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)    The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5)    The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

11.    Forfeiture of Assets

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 21 U.S.C. §§ 853 and 881, 46 U.S.C. § 70507, and 28 U.S.C. § 2461(c),

Defendant's Initials MAAR                8

whether in the possession or control of the United States, the defendant or defendant's nominees.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil judicial or administrative forfeiture action. The defendant also agrees to waive all constitutional, statutory and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

If the United States seeks the forfeiture of specific assets pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture and to transfer custody of such property to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control directly or indirectly, including all assets held by nominees, to execute any

Defendant's Initials M AA R                    9

documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant further agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct. The defendant further agrees to be polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG §1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing. In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of

Defendant's Initials MAAR          10

responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including any agreed forfeiture amount, is collected in full.

**B.    Standard Terms and Conditions**

1.    Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, <u>shall</u> order the defendant to make restitution to any victim of the offense, pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting

Defendant's Initials MAAR            11

restitution (18 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. To ensure that this obligation is satisfied, the Defendant agrees to deliver a check or money order to the Clerk of the Court in the amount of $100, payable to "Clerk, U.S. District Court" within ten days of the change of plea hearing.

The defendant understands that this agreement imposes no limitation as to fine.

2.    Supervised Release

The defendant understands that the offense to which the defendant is pleading provide for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.    Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

Defendant's Initials MAAR                12

4.    Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the count to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

5.    Financial Disclosures

Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's

Defendant's Initials MAAR          13

tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.    Sentencing Recommendations

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to

Defendant's Initials MAAR                14

withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence, whether or not such decision is consistent with the government's recommendations contained herein.

7.    Defendant's Waiver of Right to Appeal the Sentence

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8.    Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring

Defendant's Initials MAAR            15

defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9. Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10. Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty,

Defendant's Initials MAAR        16

defendant waives or gives up those rights and there will be no trial. The defendant

further understands that if defendant pleads guilty, the Court may ask defendant

questions about the offense or offenses to which defendant pleaded, and if

defendant answers those questions under oath, on the record, and in the presence

of counsel (if any), defendant's answers may later be used against defendant in a

prosecution for perjury or false statement. The defendant also understands that

defendant will be adjudicated guilty of the offenses to which defendant has pleaded

and, if any of such offenses are felonies, may thereby be deprived of certain rights,

such as the right to vote, to hold public office, to serve on a jury, or to have

possession of firearms.

11.   Factual Basis

Defendant is pleading guilty because defendant is in fact guilty. The

defendant certifies that defendant does hereby admit that the facts set forth below

are true, and were this case to go to trial, the United States would be able to prove

those specific facts and others beyond a reasonable doubt.

## FACTS

From an unknown date and continuing through the date of the

indictment, the defendant Marlon Alexis AGUILAR-Reyes (AGUILAR) was a

knowing and willing participant in a plan to smuggle more than five kilograms of

cocaine knowing, intending, or having reasonable cause to believe that the cocaine

would be unlawfully imported into the Untied States. It was reasonably foreseeable

Defendant's Initials MAAR        17

to AGUILAR that the conspiracy involved the distribution of five or more kilograms of cocaine.

### A. Organizational Structure, Purpose, and Methods of Communication

During the time period in the indictment, the defendant was part of a conspiracy to smuggle cocaine and drug proceeds through Guatemala. Members of the conspiracy received cocaine via go-fast smuggling vessels and other maritime convenyances from South America. Members of the conspiracy then transported this cocaine from the coast of Guatemala inland to the northern border of the country, where it would ultimately be smuggled into Mexico for subsequent importation into the United States. Members of the conspiracy also received bulk cash constituting the proceeds of drug trafficking, including United States dollars, and smuggled this cash to and through Guatemala.

AGUILAR had an oversight role in this organization. Conspirators, to include codefendants Daniel Paniagua-Benitez (Paniagua) and Alfonoso Ramirez-Cristobal (Ramirez), worked with AGUILAR in organizing the transportation of cocaine and money. The organization oversaw the storage of cocaine, disassembly of vehicles smuggling cocaine, reassembly of the same, and concealment of bulk cash in vehicles. Paniagua hired, supervised, and paid associates working at organizational stash houses. Ramirez would transport cocaine and drug proceeds for the organization. Ramirez picked up loads of cocaine and transport them to stash houses under the control of the organization.

Defendant's Initials MAAR.          18

Ramirez and others would then assist in the transport of the cocaine into Mexico, and receive cash from cartel associates in Mexico, including Coconspirator 1, a Mexican national involved in cocaine trafficking and money laundering. AGUILAR controlled one of the land routes between northern Guatemala and southern Mexico. He ~~utilized~~ worked with RE . MAAR corrupt law enforcement including Coconspirator 2 (deceased) and politicians such as the mayor of Tecun Uman, Coconspirator 3 (deceased) to further the objectives of his organization. ~~and provided regular payments to those individuals to protect the organization.~~ RC. MAAR

One of the methods the members of the organization used to communicate with one another was through the use of the BlackBerry Messenger (BBM) application. AGUILAR used various monikers to include "Padrino" (Godfather), "New Flack," and "NW lack." Paniagua used the moniker "Dios Es Amor" (God is Love). Ramirez used the moniker "Su Amigo Tay" as his screen name for BBM communications.

### B.    Sale of 100 Kilograms of Cocaine

Beginning in April 2018, AGUILAR negotiated the sale of 100 kilograms of cocaine for $1.2 million, or $12,000/kilogram to a buyer in Mexico, Coconspirator 5. The method of negotiating payment was through the use of currency notes as "tokens" to be exchanged through couriers. In the evening of April 29, AGUILAR and Coconspirator 5 had the following BBM conversation, the latter referred to as "CC5":

Defendant's Initials MAAR                    19

CC5:       Buddy, the boss answered me and tells me to get them but at 12 ($12,000) because he doesn't get the percentage (profit) the way he sees it.
It they give it to them at 12, he'll get them right away.

AGUILAR:  I don't think so, buddy.
That's how much they (sp) guy is giving them for, buddy (in reference to a prior discussion of $12,300 each)

CC5       Ask him to see what he says so I can tell the boss.
...
It's just that he was complaining because of the low percentage he got.

AGUILAR and Coconspirator 5 agreed on a price of "12.1" ($12,100/kilogram). In the afternoon of April 30, AGUILAR told Coconspirator 5 that the latter will get two for inspection (two kilograms) and that "Daniel (Paniagua) is going to receive them for me." After this conversation, Paniagua confirmed with AGUILAR that he had just received "100." Paniagua later confirmed that he delivered the kilograms.

Beginning in the evening of April 30, AGUILAR requested $700,000 as partial payment from Coconspirator 5 and sent a screen shot of a serial number, phone number, and password.[1] The next morning, he sent a picture of a $1 bill with the same serial number.

-----

[1] The use of serial numbers on low denomination currency notes is a common practice in the transport of bulk cash between two TCOs. Generally, members of the TCO coordinating the cash delivery will send a phone number for their courier, who then coordinates with the other TCO's courier. They are also each provided a simple password and a specific currency note as a "token." When the couriers meet, they will exchange the tokens so as to confirm with the leadership of the

Defendant's Initials MAAR      20



The next day, AGUILAR sent Coconspirator 5 another token, phone number, and password for another $500,000. On May 2, the two confirm successful delivery of the money.



### C.    Sale of 100 Kilograms of Cocaine

Beginning on May 11, 2018, AGUILAR and Coconspirator 1 (CC1) discussed the sale of 100 kilograms of cocaine:

CC1:    The "tio" (uncle) will arrive with 100 "monse" either today or tomorrow, but he'll arrive.

AGUILAR: Perfect, papa.
We'll be alert over here.
Receiving the[m], and will send them right away, God willing.

CC1:    Give him 10 thousand from the 60 thousand that you have that were to pay for the 300 that didn't come.
I have another transportation and they came out good.

---

TCO that the money was exchanged without incident.

Defendant's Initials MAAR               21

AGUILAR: Yes, yes, papa.

CC1:    We'll be taking that route.

That evening, AGUILAR spoke with one of the stash house operators, Coconspirator 6, that "Tio," Coconspirator 7, was coming. AGUILAR then contacted Coconspirator 8 and sent him the below photo of the cocaine with the message, "God willing, tomorrow morning you will have 100 platos for the party." The next day (May 12), AGUILAR told Coconspirator 7, "[t]he food is in the lunchroom already[,]" meaning that the delivery was successful.



Defendant's Initials MAAR        22

### D.   Murder of R.A.E.

On the morning of May 6, 2018, R.A.E. was found dead near the Suchiate River crossing in Ayutla, Guatemala, on the Guatemala-Mexico border. He was shot several times and his body was left on a taxi bike.

Intercepts showed AGUILAR and Coconspirator 2 (CC2) discussing the planned murder beginning on May 3:

> AGUILAR: Good evening, papa.
> Thank you papa.
> Look, I spoke to the man today and he asked me if we had looked into that 'asunto' (matter/issue)
>
> CC2: Yes, papa. I'm on it.
> Where are you, papa.
>
> \*          \*          \*
>
> AGUILAR: He will go in at 5pm.
> But they say that he gets "carreras" (trips/runs) out, it can be done there as well.
> "Saka" (possibly "saca," meaning "he gets out") the trips, papa. It goes downtown.
> It can be done at the return.
>
> CC2: So let's work hard, papa. I have those ready just to leave/go out, maybe he will leave at night.
>
> AGUILAR: Yes, man because what his face asked me today if we were working on it, and I told him yes.
> Yes, because he told me that it has to be quick.
>
> CC2: Yes, papa.
> Let's do it.

Defendant's Initials _MAAR_          23

The next day, AGUILAR and Coconspirator 2 continued their discussion about killing R.A.E:

CC2:        Good morning, papa.
            We haven't seen him yet.
            It's like he doesn't want to come out.
            We're going to try it once it gets back.
            What do you think, papa[?]
            I think that can go to the water through the river.

AGUILAR:    We have to look into how to do it.
            I'd say so.
            It'll work there, papa.
            Let's hope so, papa. It will be today.
            They're already looking into it.
(sixteen minutes later)
            They're telling me that he is at his house right now.

CC2:        Yes, papa. Because he didn't go out yesterday nor today, papa.

AGUILAR:    No, right?
            Yeah, they say he is there, at his "gth" (sic?)
            We'll have to wait, papa.

CC2:        Alright, papa. I sent them to rest for a bit because we were active since 1am, papa.

AGUILAR:    But he didn't leave, papa. Let's wait.
            He has to leave, papa.
            He already left, they say he went to the river in the [U/I]
            We have to be on the lookout.
            Because he is going to leave with [U/I] through the shore so the butchers here to the bodega.

Defendant's Initials MAAR        24

About forty-seven minutes later, Coconspirator 2 began sending AGUILAR descriptions of potential law enforcement vehicles in the area. Coconspirator 2 later sent the description of another law enforcement vehicle. After failing to find their target, AGUILAR and Coconspirator 2 continue their chat through the evening of May 5, with AGUILAR saying, "I think that man is not going to come out," then later says, "[w]e will locate him in the afternoon." At 6:37 am local time the next morning, AGUILAR confirmed that the hit was carried out with Paniagua and Coconspirator 2:

| | |
|---|---|
| AGUILAR: | What did you find out? |
| PANIAGUA: | It is done, papa. |

Coconspirator 2 also texted AGUILAR that, "The assignment is finished." After being told of this, AGUILAR told Paniagua to be "on alert" and "stay there for a while." He then confirmed with Coconspirator 2 that everything was fine and Coconspirator 2 sent a photo of R.A.E.'s body at the scene of the murder. This photo was also in local Guatemalan news reporting.

Following the conversation with Coconspirator 2, AGUILAR spoke with Coconspirator 8 (CC8) about getting rid of the guns used in the murder.

| | |
|---|---|
| CC8: | Papa, are you going to let us have the guns or what?<br>They are asking here, papa. |
| AGUILAR: | Yeah, papa.<br>Please. |

Defendant's Initials **M A A R**                    25

| | |
|---|---|
| | You have to clean them in a while, papa. |
| CC8: | The one we asked Marcos for malfunctioned, papa. |
| | *        *        * |
| AGUILAR: | Did you use the other one or not? |
| CC8: | He had both and when one malfunctioned, he took out the other. |
| AGUILAR: | They took two down? |
| CC8: | And once he saw that the other one malfunctioned he pulled the other one. I'm going to give that shit right away that does not work to Marcos, papa. |

Later that morning, AGUILAR asked Coconspirator 2 to send a video recording so he could show it to Coconspirator 3 so "he realizes that [R.A.E.] was a freaking nuisance."

### F.    Sale and Transport of 225 Kilograms of Cocaine

In this transaction, AGUILAR and others arranged for the sale of 450 kilograms of cocaine to Mexico. Discussion about the cocaine began on June 7 between AGUILAR and Coconspirator 1:

| | |
|---|---|
| CC1: | How are you doing, buddy? |
| AGUILAR: | I'm lying down buddy, because there's nothing to do, buddy. |
| CC1: | That's right, but I'll put you to work. |

Defendant's Initials M A A R          26

450 are arriving at El Brinco.

AGUILAR: When do they arrive, and who's bringing it?

CC1:       Tomorrow, El Tio.

AGUILAR: Perfect, buddy.

CC1:       I'll send you envelopes (money) tomorrow in the morning.

AGUILAR: Like that, how did it arrive, a few at a time, buddy?

CC1:       Yeah, but he is taking two cars, about two hundred a trip.

AGUILAR: Alright, buddy, you let me know and we'll wait here, God willing.

CC1:       I'll give notice to OXXO (TCO associate) now.

AGUILAR: Am I going to give you the envelopes I get or you tell me?

CC1:       Yeah, they're going to be delivered and yours is included, but we will check them once all of it is there.

On the afternoon of June 8, AGUILAR confirmed with Coconspirator 1 that "Tio" had arrived and messaged again later that he received "225," which he was getting ready to send over the border. Later, AGUILAR messaged Coconspirator 1 that two of the kilograms he had were burned and sent Coconspirator 1 a picture:

Defendant's Initials MAAR                27



### G.    Sale, Transport, and Seizure of 46 Kilograms of Cocaine

In September 2018, AGUILAR, Paniagua, Ramirez, Coconspirator 7 and Coconspirator 9 were involved in the sale, transportation, and payment for 391 kilograms of cocaine. During that event, authorities managed to seize 46 kilograms from a car driven by Guatemalan national Diego Rafael Hernandez-Rodriguez, who is now in custody in Guatemala.[2] In addition, intercepted communications discussed the transfer of $5.877 million from Coconspirator 1's organization to AGUILAR and his associates for the cocaine at $15,000 per kilogram.

On September 9, AGUILAR arranged for Coconspirator 7 to take two vehicles to load up 259 kilograms of cocaine for transport to Coconspirator 1 in Mexico City. Once that was completed, the remaining 131 kilograms were to be transported later. Coconspirator 7 successfully delivered the kilograms and sent two

---

[2] In conversations with Guatemalan SIU and a fiscal, it is exceedingly difficult to extradite a Guatemalan national once they have been arrested for an offense occurring there.

Defendant's Initials MAAR          28

BBM photos to confirm: the first was of the bricks of cocaine, and the second was all of the markings on the bricks.

On September 13 and continuing into September 14, authorities arrested Diego Rafael Hernandez-Rodriguez while he was stopped at a hotel while traveling from Guatemala City to Tecun Uman. Hernandez-Rodriguez had 46 kilograms concealed beneath the floor panels of the vehicle.

Intercepted chats on September 13 between AGUILAR and Coconspirator 7 confirm the quantity of cocaine being transported that day. In addition, Coconspirator 2 messaged AGUILAR that law enforcement was patrolling the area. After Hernandez-Rodriguez was arrested, AGUILAR messaged Coconspirator 1 that one of the cars was stopped and Coconspirator 1 responded, "[W]hy did the idiot fucking get to the hotel?....[G]et that out of that office (the stash house)!"

Following this exchange, AGUILAR spoke with Coconspirator 2:

CC2:        The black ones (police) have an operation with a pickup (Hernandez-Rodriguez's truck) by the water. BOLO.

AGUILAR:   Thank you buddy. Just between us, it's mine, buddy =(

CC2:        Oh, really buddy? But is it clean?

AGUILAR:   No, buddy

CC2:        Damn it buddy

Defendant's Initials MAAR                29

The above is merely a brief summary of the events, some of the persons involved, and other information relating to this case. It does not include, nor is it intended to include, all of the events, percons involved, or other information relating to this case.

12. Entire Agreement

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13.    Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this 31 day of _____ July _____, 2025.

GREGORY W. KEHOE
United States Attorney

_____
Marlon Alexis Aguilar-Reyes
Defendant

_____
Daniel Baeza
Assistant United States Attorney
Chief, Transnational Organized Crime

_____
Rebecca Castaneda
Attorney for Defendant

_____
Christopher F. Murray
Assistant United States Attorney
Chief, Criminal Division-South

30